**NATIONAL LOCK WASHER CO. v. GEORGE K. GARRETT CO., Inc.**

**No. 6672.**

Circuit Court of Appeals, Third Circuit.

July 22, 1938.

William G. Mahaffy and Herbert L. Cohen, both of Wilmington, Del. (Thomas G. Haight, of Jersey City, N. J., and George F. Scull and H. H. Hamilton, both of New York City, of counsel), for appellant.

Paul & Paul, of Philadelphia, Pa. (Henry N. Paul, Henry N. Paul, Jr., and John H. Austin, all of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and DICKINSON, District Judge.

BUFFINGTON, Circuit Judge.

This case concerns split ring washers used to prevent the loosening of nuts caused by jarring or shaking of the structures on which they are used. A familiar and long used type of split ring was the nut lock to hold in place the two angle bars located on the sides of abutting rails.

The British patent No. 1230, to Grover, for a split ring, showed a device for preventing the nut from loosening by turning up the ends of the split ring. He thus describes his device:

"My invention consists in constructing washers of metal rings, by preference of tempered steel, which washers are cut completely through at one point, each of the two severed portions being respectively

deflected or bent in opposite directions from the plane of the washer. Each severed portion forms a sharp cutting edge, which, on the nut being screwed up, bears hard respectively against the base or fish plate, and against the under surface of the nut, while the washer formed as above constitutes a spring which, as the nut is screwed up, is compressed, and thus causes the projecting edges to press with increasing force. The said cut ends are turned up in the contrary direction to that of the thread of the bolt on which the washer is to be employed, so that the washer will permit of the screwing up of the nut, but will resist its unscrewing by means of the said edges tending to bite into the surface of the nut and the base.

\* \* \* \* \* \*

"Fig. 4 shows the nut $B^1$ screwed home so as to compress the washer between it and the base, fish plate, or other object C to which the bolt, nut, and washer are applied. In attempting to turn the nut back so as to unscrew it the spring of the washer causes the edges $a^3$ and $a^2$ to bite into the under side of the nut $B^1$ and upper surface of the base C, thus offering a great resistance to the unscrewing of the nut."

Stating wherein invention lay, Grover says:

"Having thus described the nature of my invention, and in what manner the same is to be performed, I claim, the use of spring washers so divided by a single cut across one part of their periphery, and bent on each side of the cut as to present cutting edges to resist the unscrewing of the nuts to which they are applied, substantially as herein described."

Manifestly his invention, which we assume went into use, concerned the holding in place of the nut after the nut lock was in place and had nothing to do with means for putting his nut lock in place. In other words, when his nut lock was to be used, it was put in place and by screwing tight its turned up ends bit into the opposing surfaces.

In the Garrett device shown in patent No. 1,560,228, granted November 3, 1925 to the Vice President of the defendant company for a "method of and Apparatus for Making Lock Washers," it will be seen that the washers made thereunder, embodied in a modified form the "biting in" principle of Grover's device. In that regard Garrett's patent says: "My invention relates to a novel method of and apparatus for automatically and expeditiously making lock washers, wherein the bar from which the washers are made is serrated or roughened on both sides simultaneously during its propulsion towards forming or coiling devices * * * where the coils are automatically cut to produce the finished washer which is offset at its juxtaposed ends, and provided with serrations on the opposite surfaces thereof."

As to the diameter of the coils, Garrett states his machine is "adjusted so as to form each convolution of said coil slightly less than a full revolution, thereby causing the cutter to sever convolution of coil with the ends thereof spaced apart with a slight clearance when the same are brought into alignment."

We assume the machine and process went into use and when once set in place, prevented the nut from torsional turning by its "serrations" on the opposite surface of the split ring in the same way Grover did by his ring ends turned up in the contrary direction to the thread of the bolt, "which will resist the unscrewing by means of said edges tending to bite into the surfaces of the nut and the base."

But neither of the split rings shown by these two patents mentioned was addressed to or helped solve a difficulty that arose in a new art, namely, the movable platform used in the production of automobiles, where some part of the construction of automobiles was done by men at different short stopping stages. This staged work on automobiles came into use during the World War. In that regard the testimony of Gempler, in charge of motor assembly— and his testimony is uncontradicted—is:

"Originally motors were assembled by bench methods. That is, each individual cylinder block was taken and set up on a bench and then each part, as it came along, was assembled in the proper rotation: First, the crank shaft and valves and then the cam shaft and so on, pistons and connecting rods, until finally the complete motor was assembled. At the present time such assemblies are carried on by what are called power conveyors. Mr. Ford was among the first to initiate the power conveyor.

"It came into use in the Ford plant approximately along in 1918, if he remembers correctly. It might be 1917 or 1918. It was during the duration of the war. He could not give the exact date as to that."

But when this power conveyor system was used, a new difficulty developed, namely, the tangling of one split ring with another. Gempler testified:

"There was considerable trouble as to tangling of such washers, in fact that was one of his main kicks, because it took so many men to untangle them."

Another witness, Radford, was in charge of complaints from the factory of his employer, the Reo Motor Company. His testimony was that his company introduced the moving assembly time practice some time during the World War. In that regard his proof was:

"The tangling of washers was called to his attention very markedly, because they complained of the tangling of the washers and the time lost in the shop because of the tangling. He could not say just definitely how far back those complaints dated, but it was back around the war times. This tangling of the washers was made a more acute problem than originally by the introduction of the moving assembly line and putting the assembly on what was termed group work where the chassis would be moving and each man working on the line had a definite time to accomplish his part of the work.

"Q. And how far back did those complaints date, as you now recall?

"A. I could not say just definitely the date, but it was back around the War times."

He further said:

"The assembly line was introduced at the Reo Works some time prior to the World War because during the World War they were in the manufacture of tractors and used this same assembly line on the tractor manufacture, that would have been in 1917 and 1918."

As to complaints about the tangling of the split rings then used, his testimony was:

"When these complaints came to him, he was forced to take the matter up with the manufacturers of split ring washers to get it remedied. They made some experiments with what was known as a Shakeproof washer, a continuous ring type, with the idea of going from the split ring washer to the Shakeproof washer to eliminate the difficulty of tangling. He knew of no split ring washer which would not tangle, they had never had one presented to them."

As to complaints about the split rings then in use, Gempler, the Ford manager, testified:

"There was considerable trouble as to the tangling of such washers, in fact that was one of his main kicks, because it took so many men to untangle them. * * * He personally spoke to the Purchasing Department time and again in regards to getting somewhere with the lock washer manufacturers to get some of the lock washer manufacturers to manufacture lock washers of some kind that would not tangle due to the fact, for one thing, that he wanted to save the men that were untangling, and also he had a proposition in mind whereby the lock washers could be assembled on bolts by hopper methods. And that was natural in his position because he wanted to make good on his job. He wanted to be of a progressive type, and that was one of the things he had in mind, to make it so that they could hopper the washers in one hopper and the bolts in the other and to assemble the two together and hand them on trays to the assembly lines.

"Prior to 1927 they did not find anything that would not tangle or that did not tangle, although a Jack Karn, their purchasing man, brought in several types of lock washers. In the neighborhood of 1927 or 1928 they eventually got some Kantlink washers that would not tangle. He fixes the date in the neighborhood of 1927 or 1928 because in 1926 they moved from Harlam to River Rouge, and it was shortly after that that the Kantlink washer came into use.

"Ford used the Kantlink type of washer exclusively up to the time that he left the plant assembly in 1931."

The testimony of the foregoing witnesses is strengthened by that of Carpenter, a salesman of lock washers for many years, who worked for several different companies, who says:

"The assembly line accentuated the difficulty (tangling) so that people began trying to find some way in which to avoid this difficulty. Such an attempt was made with some of the larger motor companies like Buick, the Olds Motor, the old Oakland Motor Car, now the Pontiac, and his employers did everything they could for them but nothing could be done until about 1924, when they had a competitive washer come in, which was a non-tangling washer. That is the Shakeproof."

The foregoing testimony and other proofs in the record satisfy us that from the end of the World War period until 1928 the objections to split ring tangling existed, was recognized, was sought to be overcome by large companies, but no solution was reached until 1928, when the plaintiff's patent was granted.

It will therefore be seen that on the two basic questions underlying this case, the trial Judge was right in holding as to the first namely, "the problem of interlinking came with the high speed mass production methods in the automobile industry", but was in error in deciding the second, namely, "the need for non-interlinking washers was not expressed until about the time Loutrel made his invention".

Such solution was disclosed in patent No. 1,655,018, granted January 3, 1928 to Loutrel for a compression spring washer. The patent is in its way unique. As stated by the trial Judge in his opinion,

"Loutrel made an analysis of the geometrical considerations entering into the question of the interlinking of washers. He was the first to make that sort of an analysis. He has set forth an interesting description of the reasons why certain washers will link with each other from a mathematical point of view. * * *

"The patent purports to cover washers which are 'in the general form of a helical segment.' It describes the geometrical considerations entering into the questions of interlinking. It specifies four ways in which washers interlink. The patent teaches that the way to overcome interlinking is by means of a split ring in the general form of a helix with ends cut at an angle and separated by a slight clearance. * * *

"Defendant has not offered in evidence any washers in use before the date of the patent."

The patentee in his specification shows several types of split rings and points out why they did not prevent tangling and bases his claim to invention on the fact that he was the first to disclose in the split ring art the combination of a ring slightly in excess of 360° circumference and angle cut ends. This combination of plus 360° and angle cut ends was new and was discovered by Loutrel as the result of the critical analysis he made and subsequently disclosed in his patent application. These two elements for the first time used in coacting combination he carried into his two claims. Angle cut ends were known; plus 360° circumference was also known. But in spite of the urgent call of the art for a non-tangling split ring for at least eight years, no one disclosed Loutrel's combination. The plus 360° feature did not solve the difficulty; neither did the angle cut ends, but when the patentee studied why each of the attempted solutions failed, he discovered how the failures of the past could be turned into success by the novel combination of these two elements in a cooperating combination. No one had ever done this before. No one had ever mathematically analyzed the failures of the past. No one had pointed out—or indeed realized—why they had failed, and it remained for Loutrel to study the problem and show that by the simple combination of elements, individually old in isolation, could be given problem solved efficiency, when cooperatively, for the first time, coactively combined. The device being novel, we next inquire whether it was useful.

In that regard the proof is uncontradicted that the device was favorably received, first by small companies, but eventually by the large automobile companies, which attested its worth by paying from twenty-five to forty per cent over the price of the ordinary split rings. Among its users are General Motors, Ford Motor Car Company, the entire Chrysler interests, Packard and Reo. Up to 1937 plaintiff's sales nearly reached three million and its licenses nearly eight and three-quarter millions.

In view of all the cited proofs of the call of these great industries for a number of years for a non-tangling split ring; of the futile attempts to meet it; of the signal success of plaintiff's device and the prima facie proof of invention by the issuance of the patent, we hold the patent valid.

In view of the length of this opinion, we refrain from discussion of the alleged infringing character of the defendant's structure, limiting ourselves to saying that had the defendant's non-tangling split ring, plus 360° in circumference and with angle cut ring ends, been in the art before Loutrel, it would have invalidated the latter's patent by anticipation. Coming later, it clearly infringes.

So holding, the record is remanded with instructions to reinstate the bill, decree the patent valid and infringed, and direct an accounting.