## GENERAL TIRE & RUBBER CO. v. FISK RUBBER CORPORATION.
### No. 7928.

Circuit Court of Appeals, Sixth Circuit.
April 5, 1939.

As Amended on Denial of Rehearing
June 28, 1939.

Albert L. Ely and Wm. C. McCoy, both of Cleveland, Ohio (Wm. C. McCoy, Frank S. Greene, Evans & McCoy, and Albert L. Ely, all of Cleveland, Ohio, on the brief), for appellant.

F. O. Richey, of Cleveland, Ohio (F. O. Richey, of Cleveland, Ohio, and F. G. Neal and C. T. Neal, both of Springfield, Mass., and Richey & Watts, of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

The Fisk Rubber Corporation, appellee, sued The General Tire and Rubber Company, appellant, for infringement of designated claims of nine different patents of which appellee was the assignee-owner. The case was referred to a Master who found certain claims of three of the patents to be valid and infringed, namely, Nos. 1 to 10, inclusive, and No. 14 of Patent No. 1,742,777 issued January 7, 1930, to Midgley; No. 4 of Patent No. 1,723,501 issued August 6, 1929 to Castricum, and Nos. 3 and 4 of Patent No. 1,541,396 issued June 9, 1925 to Rossbach. He found the claims sued on in the remaining six patents either invalid or uninfringed. The court confirmed the Master's report and entered the usual decree for an injunction and an accounting. Appellee having during the suit filed disclaimers as to certain of the claims sued on, was allowed to recover only one-half of its costs. Appellant, in accordance with Equity Rule 67, 28 U.S.C.A. following section 723, was taxed $5.00 for each of its overruled exceptions to the Master's report.

Appellant's assignments of error raise: As to the Midgley patent, the defenses of anticipation, indefiniteness in the claims, non-invention, non-infringement, double patenting, and, in addition, the defense that Claims 1 to 9 thereof for a method were functional and hence invalid as involving nothing more than the operation of the machine; its defense of non-invention as to Castricum; and its defenses of non-invention and non-fringement as to Rossbach, and that the Rossbach claims were functional. In addition, it complained of the ruling that the disclaimer of Claim 15 as to Midgley did not affect the validity of the other claims in issue and it objected to being taxed with half the costs since it prevailed on six of the patents in suit and since appellee filed disclaimers in three of the patents after the commencement of the suit.

The three patents here involved are in the tire building art. They relate to improved methods or apparatus for calendering sheets of rubber and cords into a single unvulcanized sheet in which the rubber entirely surrounds the parallel cords arranged in its central plane, and known in the industry as cord tire fabric. The product is a smooth rubber sheet, disclosing at its ends the embedded cords.

According to Midgley, a tire needs "the cords for strength and the rubber for protection to the cords and for resiliency in use." Other materials than cords had been used for strength, including woven fabric and an arrangement of cords held together by an occasional weak-weft thread. Generally speaking, fabric and weak-weft cords had two disadvantages: One structural, in that the threads and cords tended to chafe and wear out where they crossed, when built up into layers in a tire; and the other, in the matter of cost, since both materials needed a preliminary processing (the weaving) in another type of factory. But unwoven cords resisted efforts to embed them easily and securely in rubber. Rubber and cords (or rubber and fabric for that matter) have no natural affinity. With fabrics and weak-weft cords it was possible to grind the rubber in by "frictioning," that is, by operating the calender rolls at different speeds. Even when the calenders were operated at the same speed (skimming) unwoven cords tended to be distorted and to "float" around in the rubber under the pressure, and the product had to be scrapped. It was possible to pretreat the cords by dipping them into a solution of gasoline or other rubber solvent, to impregnate them with rubber and render them more adhesive. But this process called for special apparatus, took time and created a distinct fire hazard. Even so, it was used by at least one major tire company.

## Midgley No. 1,742,777

Midgley claimed to meet the difficulty of adhesion by heating the cords prior to running them through the calender to a degree rendering "momentary contact with the workman's hand uncomfortable but not hot enough to make a burning contact." The heat was a substitute for the solvents and for the evils of "frictioning." He claimed to meet the difficulty of disarrangement under the pressure of the calender, by spacing and "equalizing" the tension of the heated cords and feeding them thus arranged by means of a roller in contact or near contact therewith, against the sheet of unvulcanized rubber on one of the calender rolls, in advance of the bight. He claimed that the pressure of the roller and the tensioning caused gradual embedment of the cords into the sheet as the roll moved toward the bight and that they thereby became fixed therein so as to resist displacement under the ensuing pressure.

The calender used by Midgley consisted of four rolls arranged one above the other in perpendicular alignment, and lettered A, B, C and D from top to bottom. These rolls were arranged in adjustable vertical guides, so that the space between them could be independently varied to suit operating demands, A being adjustable with reference to B, and D with reference to C, for governing the thickness of the rubber sheets. In addition, B was adjustable with reference to C, for controlling the pressure on the cords and the rubber in the B-C bight.

In forming a composite sheet of rubber and cord, the unvulcanized rubber is fed in banks to the bights between A and B, and C and D, respectively, and is sheeted out between them, an overlapping arrangement at the end of the rolls limiting the width of the sheets. These sheets then follow around rolls B and C to the B-C bight, the cords, as we have said, meanwhile having been fed into contact with the sheet on roll B prior to entering the B-C bight. Rolls B and C operate at the same speed, but rolls A and B are operated at slightly different speeds in their respective pairings, the better to work the rubber into sheet form.

The sheet produced was fifty inches wide and the cords ran over twenty to the inch. These thousand and more cords had to be accurately spaced and controlled at the time of application to calender roll B to produce the parallel alignment and proper tension for perfect fabric. There was a sketchy description of the tensioning arrangement in the patent. From the creel, the cords were led through guides, over stretching rolls, over and under the tension equalizing rolls, then through an expanding comb and another guide roll to the heating rolls. The latter were hollow and four in number and when size 10 cords, twenty-three to the inch, were laid across them at normal calender speed, sufficient heat was imparted to them for the purpose of the patent, if the steam pressure in the four rolls was approximately fifty pounds.

From the heating rolls, the cords were separated, one set being fed to grooved roll 24 in the drawings, and the alternate cords to grooved roll 25. The grooves on 24 are in line with alternate grooves on roll 62, which introduces the cords to the rubber sheet on calender roll B, and the grooves on 25 are spaced to line up with the intermediate grooves on 62. This separation "insures against one cord being in a position to crowd or ride over an adjacent cord either just before or as the cord meets the rubber sheet." This is particularly true where the cords are, as here, as close as twenty-three to the inch, and, as was testified, running 40 to 50 yards per minute.

All three of these rolls, 24, 25 and 62, are mounted on a movable guide which may be adjusted to bring roll 62 with its very shallow grooves, with depth less than the thickness of the cords, against the rubber sheet on B. This manner of application of the heated cords to the hot rubber sheet is the key to the invention, if any, and it will aid in an understanding of the operation to quote from the specification:

"The grooved roll 62 * * * preferably presses the cords directly into the sheet and holds them therein by means of the position of the roll. * * * This arrangement presses the cords into the sheet as they meet it between the bight of roll B and roll 62. The arrangement of roll 62 and the fact that it is grooved places the cords on and in the rubber sheet and holds them there against any lateral shifting. * * * The meeting point of the cords and rubber sheet 70 is preferably made at a sufficient distance along the arc or surface of roll B from the bight between rolls B and C, to insure a substantial hold by the pressure of the

cords against roll B as they travel with it. This prevents lateral movement of the cords as they meet the second sheet of rubber 71 in the bight of rolls B and C. The cords are thus pressed into sheet 70 and the rubber of this sheet is pressed between spaced cords. When the cords and sheet 70 meet the rubber sheet 71 between rolls B and C the elements of the composite sheet are all preferably travelling at the same speed. There is just enough pressure between these rolls to join the sheets 70 and 71 between the spaced cords and to insure by contact the adhesion between sheet 71 and the heated cords. The two sheets of rubber thus become one homogeneous sheet except where the cords are, but the rubber of one sheet surrounds and adheres to all the spaced cords * * *."

Roll 62 may be positively driven, may be turned by the motion of the cords, or may be held stationary. Rolls 24, 25 and 62 are removable and may be replaced by others for the use of different sized cords. Claim 4 of the nine method claims typifies the process we have described; and Claim 14 of the two apparatus claims serves better than Claim 10 to cover the apparatus. We copy both claims in full:

"4. The method of embedding cords in rubber which consists in feeding hot cords in spaced parallel relation to a hot sheet of rubber on a calender roll for contact with said sheet over a substantial arc, and then, while maintaining the cords and rubber hot, feeding said sheet with the cords adhering thereto and with a second sheet of hot rubber to cover the cords on the first sheet between two calender rolls to form a composite sheet."

"14. An apparatus for joining cords and rubber comprising cord heating means, a calender to sheet out hot rubber and a device between the heating means and calender to arrange the hot cords in their exact desired relative relation one to the other, and operable to press the cords in such relation against the rubber on a calender roll before the cords with the rubber are fed to the bight of the calender rolls."

*Invention.* Appellee conceded, and the Master found, that all the elements of the Midgley machine were old, and, if the claims were to be held valid, it must be that the "combination produces a new result or an old result in a new and better way" and the improvement must be "more than might have been expected of one reasonably skilled in the art." Stockham Pipe & Fittings Co. v. Ohio Steel Fdry. Co., 6 Cir., 78 F.2d 111, 113.

The most pertinent reference in the prior art was Patent No. 493,220 issued to Palmer March 7, 1893. Palmer's object was to produce a fabric, made of flexible threads, not interwoven, but held together by rubber or similar material as a covering for hose, belting, bicycle tubing, washers, etc., thus eliminating the sawing and cutting action of threads on each other where they were in contact. The specifications show that the rubber was passed through calendering rolls and "during its passage there are fed thereto to be pressed and thus embedded therein threads of flexible material * * *." Palmer's drawing was diagrammatic, showing the cords being fed toward the rolls on one side and a sheet with the cords embedded therein being drawn from them on the other. There was nothing to show where the rubber came from nor how it, or the threads, were fed to the rolls; and, although Palmer himself testified that the "sheet of cord" was "fed to the calender touching the rubber sheet first, as the adjacent roll was highly polished steel, and the rubber served to hold them in their original position until the bight of the calender jammed them into the rubber," in a drawing of such a skeleton nature, we cannot grant appellant's contention that there was significance in the appearance in the drawing that the threads were fed to the rollers at an angle, rather than directly to the bight. Granted that this was true, no mechanic could deduce from the specification or the drawing the method or practice of feeding cords to the rubber sheet over a substantial arc in advance of the bight. As a matter of fact, Palmer in his specification said,—"* * * any convenient way of feeding the threads to the sheet while passing through the calendering machine will serve the purpose * * *." It will be noted also that he refers to one sheet only, since the other roll was polished steel. This was essentially a product patent, seven of the nine claims being for a product, and the other two too indefinite to follow, and the product, over which there was contrary testimony as to quality, Palmer himself testified was not as good as that produced by the Midgley method. Moreover, from a reading of the specification and claims there is every in-

744

dication that Palmer did not completely cover the cords with rubber but simply fixed or implanted them rather deeply into one side of the sheet of rubber. Palmer in his testimony confirmed this, pointing out that "there was always a portion of the threads next to the polished roll of the calender that couldn't be covered in one operation * * *."

The Palmer method was used extensively in the manufacture of bicycle tires and to some extent in the production of automobile tires, but when automobile tires began to be produced in quantity, fabrics or weak-weft cords were used as the basis for the sheets, and not the unwoven threads of Palmer. Palmer's testimony reflects the practice. He stated that the Goodrich Company and others of his licensees had made tires of weftless fabric, that he himself had done so, "but not by preference. * * * The trade went almost universally to the weft fabric, the weak-woof fabric, as I call it, simply for the reason that it was more convenient, gave them something to go on that necessitated the least expenditure of money for equipment, and the patent situation also had its influence no doubt, but the ease of inaugurating the manufacture of cord tires was best served by the weak-woof fabric. They could handle it just the same way that they could handle the ordinary fabric. Buy a bolt of it and take it to the calender and run it through."

We can hardly deduce from this that Palmer's device was practically applicable to the production of weftless automobile tire fabrics. In this connection we note that on December 5, 1922, a much later date than Palmer, Patent No. 1,437,859 was issued to O'Neil, appellant's President, for production of a *frictional* fabric of uniform thickness throughout "in which the *warp cords* are entirely surrounded by a substantial cutting of raw rubber." (Italics ours.) Notwithstanding Palmer, and barely six months before Midgley applied for his patent, O'Neil had applied for this patent, which was still concerned with eliminating the thick and thin zones from weak-weft cord fabric.

Of other patents emphasized by appellant as voiding Midgley, for lack of invention, Solis No. 30,891, December 11, 1860, provided a toothed guide in advance of a revolving grooved guide, for holding elastic threads in place, prior to fixing them between two lamina of cloth in the making of shirred goods. There were two calender rolls with cloth fed to each roll in advance of the bight. The grooved revolving guide apparently fed the threads into contact with one of the layers of cloth as it moved along the calender arc to the bight. There are superficial likenesses between a drawing of Solis and of Midgley; but when it is considered that the Solis problem, as outlined by the patent, was simply one of controlling threads on the revolving guide; that there was no problem of pressure in applying them to the calender roll, nor of embedding them in a swiftly moving rubber sheet, it is clear there is no anticipation. The superficial resemblance between Solis and Midgley takes no account of the widely divergent materials involved in the respective operations, nor of the novel problems arising from the use of such materials. The problem of alignment was the same, but those of affixing and embedment, as well as of treating the materials beforehand, were dissimilar.

Pearce, No. 376,343, January 10, 1888, applied *skim* or calender coats of rubber to *fabric* in two separate calender operations. He fed his fabric over a guide roll before bringing it, in advance of the bight, into contact with the bare calender roll. It is conceivable that this arrangement, as well as that of Solis, may have given Midgley an idea to work on, but it is clear that the feeding of a fabric against a bare calender roll would be little aid in aligning and embedding hundreds of unconnected cords into a swiftly moving rubber sheet.

Upon consideration of these references and the following additional ones not particularly emphasized, to wit, Castricum No. 1,544,217, June 30, 1925; Jameson Reissue No. 15,349, May 9, 1922; Marquette No. 1,321,223, November 11, 1919; and Fisher No. 1,402,288, January 3, 1922, we are not persuaded of the lack of invention in Midgley's combination. It was certainly useful, and appellant has failed to sustain the heavy burden of proving its want of novelty. Mumm v. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983. In several instances the art came close to Midgley's method and apparatus but in none was his working combination present for the obvious reason that none embodied his inventive concept.

Midgley's earlier patent No. 1,509,-365, September 23, 1924, assuming that it contained disclosures found in his later patent, is not to be considered prior art for purposes of determining invention, since both patents were applied for by the same inventor and were copending before issued. Toledo Plate & Window Glass Co. v. Kawneer Mfg. Co., 6 Cir., 237 F. 364, 367.

The defense of double patenting is urged against Claims 2, 4 and 8 of Midgley. It is said that these claims are substantially for the same invention as Claim 17 of the earlier Midgley patent No. 1,-509,365. It is probably enough to say that this defense was not pleaded, but we go further and note that Claims 2, 4 and 8 are method claims while Claim 17 is for an apparatus.

In Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 71 F.2d 539 at page 561, it was said: "It is entirely proper to cover the same disclosure by two patents—copending—one for the method and the other for the apparatus." See also Dayton Fan & Motor Co. v. Westinghouse Elec. & Mfg. Co., 6 Cir., 118 F. 562, 572.

It is further said that Claim 18 of the earlier Midgley patent is essentially the same as Claim 10 of the later Midgley. We cannot accept this as true. An essential element of Claim 10 is an apparatus which comprises means to fix the cords in position on a calender roll before the rubber and cord enter the bight. Claim 18 says nothing about a mechanism for fixing the cords in position on the roll.

After the Master's report was filed, appellee disclaimed Claim 15. That claim was limited to a calender of three rolls, to which the apparatus claims held valid were not so limited. Appellant contends that since Claim 15 was held to be infringed by the Master (citing page 1485 of the record) if appellee disclaimed it being narrower than the others, the disclaimer must necessarily yield to the public the entire invention, as set forth in the broader claims. Citing 35 U.S.C. §§ 65 and 71, 35 U.S.C.A. §§ 65, 71, dealing with disclaimers. On page 1465 of the record, the Master in unmistakable reference to Claim 15, had declared it invalid for want of inventive conception in view of Jameson, Castricum No. 1,544,217, or Marquette. Subsequently, on page 1508 in his "summary of the law and facts in connection with Midgley Patent No. 1,742,777" he made this, his ninth, conclusion of law. We give the exact quotation: "(9) All of the claims in issue *except Claim 15* are valid and all *except* 15 and 17 are infringed." (Italics ours.)

Again, on page 1515, he referred to Claim 15 as being invalid.

It is urged against Midgley that his method claims simply embody the function of a machine and were hence invalid. We have called attention to the lack of affinity between cords and rubber as such, and of the practice of soaking the cords in some rubber solvent in order to make them adhere. Midgley substituted the heating of the cords and the rubber preliminary to the affixation. The heating process is described in Claim 4 and the apparatus in Claim 14. It is rudimentary that rubber and cords cannot be made to stick together by mere mechanical pressure. This being true, the process included more than a mechanical action of the machine; there is in addition, chemical conditioning, or conditioning by heating. It follows therefore that the process claims, either expressly or by implication, embody some treatment of the materials over and above the functioning of the machine. Such process is the subject of a patent. Walker on Patents, 6th ed., Sec. 19, p. 25. See also Peale-Davis Co. v. West Ky. Coal Co., 6 Cir., 95 F.2d 655, where a process utilizing pneumatic action was held good, and the discussion in Black-Clawson Co. v. Centrifugal Eng. & P. Corp., 6 Cir., 83 F.2d 116, 119.

It is also said that Midgley's method Claims 1, 2 and 3 were void because they called for feeding the cords to the rubber under "equalized tension"; that the term "equalized tension" was too indefinite. We think that the call for "equalized tension" was one for workable, uniform tension which was achieved by manipulation of the various adjustments on the machine. Exact equality of tension on the cords was beyond attainment, and practically unnecessary. What was prescribed and apparently achieved was "good commercial" equalization. See General Motors Corp. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876, 886.

*Infringement.* Appellant acquired its machine from a maker who had built the first machine for appellee according to its specifications. At the time it was acquired

appellant was warned that appellee claimed a patent on it. After it was installed with help from mechanics of another licensee of appellee, appellant used the machine in defiance of appellee and its patents.

Appellant's operation, as revealed by interrogatories and answers, utilized a four roll calender with the top roll offset, each roll being adjustable with reference to the others while the calender is in operation. Hot rubber was sheeted between the upper part and the lower part and passed around the metal bar to the bight between them. Passing through various tensioning devices, whose exact working we deem immaterial, the cords pass over and under seven heating rolls, heated by steam at about twenty-three pounds pressure. The cords then pass over a fixed bar and downwardly through an inverted, adjustable comb, the teeth of which separate the cords in pairs or groups; after which they pass over an evener bar which serves to smooth out the sheet of unconnected cords. The cords then pass under a spacer bar with four arcuate segments separated by four intermediate flat faces. The arcuate segments are cut with parallel grooves at the exact individual cord spacing desired in the finished product. The width of the grooves is greatly in excess of the depth and the depth is less than half of the diameter of the smallest cord used. The cords pass under the spacer bar and through the grooves bending around it and passing on to the surface of a smooth roll which is pressed against the lower of the two middle rolls of the calender. The spacer bar, smooth roller and calender are all close together, so that the cords are finally spaced as they pass through the grooves, and are held in place around the smooth roller by their tension. The cords pass around one quarter of the circumference of the smooth roll and are pressed by it part way into the rubber sheet on the lower of the two metal calender rolls, whence they are carried into the bight between them, and the exposed sides of the cords are pressed into the second rubber sheet. The spacer bar and smooth roll are mounted on a slide for moving in and out of operative relationship with the calender roll. The smooth roll and calender roll necessarily run at the same speed, since the smooth roll is free running and the cords are drawn around it by the pull of the calender.

Appellant claims that it does not use the same heating arrangement as Midgley. We do not agree. The apparatus used is similar and the results achieved are the same.

As indicated above, the first nine claims are for method. Claim 1 calls for the method of incorporation of cords in a rubber sheet by means of a calender, the cords being spaced and parallel, and under the equalized tension (which we have gone into) and running at the same speed when applied to the rubber on the calender roll and firmly contacting it through a substantial arc before passing through two calender rolls.

Claim 2 calls for the forming of the rubber sheets and passing the cords between both sheets to completely surround the cords with rubber.

Claim 3 calls for a hot sheet of tacky rubber to be joined with hot, uncoated cords.

Claim 4 we have heretofore quoted.

Claim 5 calls for feeding the cords against the rubber on one of two calender rolls and causing a pressure of the cords against the rubber in advance of the bight.

Claim 6 calls for hot, unrubberized cords to be joined to hot calender rubber on one of two calender rolls.

Claim 7 joined unconnected cords to rubber on a calender by feeding the cords and rubber to the bight from a curved path on the surface of one of the rolls after they had been pressed into the rubber.

Claim 8 joined unconnected cords with rubber to make a composite sheet of predetermined proportions by feeding cords between two rubber sheets of predetermined gauge. The fact that the calender rolls are adjustable in appellant's machine makes it possible to sheet out the rubber to a designated thickness, and the machine was designed to practice that method.

Claim 9 calls for positioning parallel unconnected cords in a rubber sheet between calender rolls without relative displacement by the method of fixing the cords while in their relative positions by preliminary pressure against a tacky sheet on one of the calender rolls and then carrying them between the calender rolls

for pressing the cords and rubber into more intimate association.

Claim 10 is for an apparatus to join the cords and rubber by application to the sheet on one calender roll, fixing them in position thereon before the rubber and cords enter the bight, irrespective of how the cords and rubber have been pretreated.

Claim 14 we have heretofore quoted.

We concur in the finding of the Master and the court that these claims 1 to 10 inclusive and 14 are infringed.

### Castricum No. 1,723,501.

The Castricum patent, like Midgley, related to apparatus for making cord tire fabric. It was adapted for use with a four roll calender with the top roll offset, the operation of which, however, was similar to the vertical type used by Midgley. Castricum's other innovations were confined to cord guiding apparatus, which he claimed was more easily interchangeable, spaced the cords more accurately and rendered them more accessible for the repair of breaks. The apparatus is mounted near the calender on a sliding frame which moves it in and out of operative relationship with the calender.

As the cords approach they pass over a rod or bail which serves to support them in the chief spacing means, an inverted comb of the lazy-tongs type and having teeth only on those bars of the tongs extending in the same direction. The cords pass between the teeth of the combs which are adjustable as a unit, the whole having been described in the patent to Castricum No. 1,531,689, 1925.

From the combs the cords passed over another rod or bail which supported them in the threads of a stationarily mounted screw threaded rod. In Midgley the cords were applied to the rubber sheet on the calender by a grooved roller. In Castricum the applying roller was smooth but next to it was the screw threaded rod, whose function it was "to insure absolute accuracy in the cord spacing at the last moment before the cords reach the smooth-surfaced roll. * * *" This rod could be screw-threaded since it was stationary in the mounting and much cheaper to produce than the circumferentially grooved roll of Midgley. It was easily removed, facilitating the use of other rods with different threadings when other cord spacings were desired. The "smooth-sur-faced roll" could also be moved in and out by a hand wheel to vary its pressure against the calender and beneath this roll was a clamp which could be elevated to hold the cords firmly against it, when production was stopped; thus maintaining their tension and spacing as long as the calender remained idle.

Claim 4, the only one in suit, is as follows: "4. Apparatus for use in the manufacture of weftless cord fabric comprising a four roll calender having its top roll offset, the outer pairs of rolls forming rubber sheets and the central pair pressing the two sheets together, a roll underlying the offset roll and contacting with the sheet of rubber on the lower of the central pair of calender rolls, and a comb mounted with its open side downward and in a position to receive and guide cords traveling in a path slanting downwardly towards the said underlying roll."

*Invention and Infringement.* The prior art includes Fisher, No. 1,402,288, hereinbefore referred to. Fisher used a four roll calender with top roll offset, but made no claim for it. His apparatus is otherwise unlike Castricum. Hutchinson, No. 31,391, February 12, 1861, and Hull, No. 68,365, September 3, 1867, used the four roll calenders with the top roll offset but they are otherwise dissimilar to Castricum. Combs were old. The Master said: "The features of the combination claimed to give it utility are the offsetting of the top roll, the pressure roll underneath the top roll and adjacent the center of the three vertically arranged rolls of the calender, and a comb set with its teeth downwardly and in position to guide the cords which cords come to it in a downwardly slanting direction. * * *" He saw appellant's machine in operation, that it used the arrangement of parts, which, if old, were novel with Castricum in their assembly and concluded that the combination must have had decided merit; otherwise appellant could easily have made some change to avoid the claims. He found the claim both valid and infringed.

We are impressed that the advance of Castricum was meritorious and the appellant has accorded the patent the tribute of imitation. The Master's finding, concurred in by the court, must be sustained, both on the question of invention and of infringement. Merit Oil & Equip. Co. v. Fry Equip. Corp., 6 Cir., 48 F.2d 488, 490.

Rossbach No. 1,541,396.

Rossbach provided "new and improved means for supplying stock for a calender." The "stock" was the unvulcanized rubber from which the sheets were pressed. The problem was to cut stock from the roll of the warming mill and transmit it to the calender and distribute it evenly along the bight.

The apparatus disclosed a pair of knives secured to a block, and connected by gears and a cam with the movement of the mill, so that as it revolved the knives moved back and forth along the long axis of the roll of the mill and in contact with it, cutting a continuous spiral strip of rubber from it.

The strip then passed to a conveyor, being carried upwardly between two endless belts to a transversely moving belt which carried it to the distributor. This latter consisted of a framework carrying a plurality of vertically disposed rollers between which the strip was adapted to pass. This framework of the distributor was pivotally mounted at its upper end and connected with arms to a cam, attached to the calender roll shaft, so that its discharge end oscillated along the bight of the calender, effecting a uniform distribution of the rubber strip thereon.

Adjustments in the rate of feed could be achieved by operating the warming mill, cutting mechanism and conveyor at a different relative speed from that of the calender.

Claims 3 and 4 are in suit. We quote 4: "4. In combination a warming mill, a calender, means to cut material on the mill, means for conveying the cut material from the warming mill to the calender and means for distributing the material along the calender roll."

*Invention and Infringement.* Ackerman, No. 768,891, August 30, 1904, was cited by appellant as prior art. It consisted essentially of two or more paired knives, affixed to cut strips of rubber from the sheet rolled out by the rolling mill. The knives were fastened to a bar positioned in parallel relation to the mill roll and could be adjusted with reference to each other to vary the width of the strips cut. Similarly, the rolls of the mill could be adjusted to vary the thickness of the sheet rolled out. The strips were carried by a moving belt to the calender rolls.

Ackerman did not have the oscillating delivery arrangement to the calender.

Clark No. 1,226,949, May 22, 1917, carried its rubber stock to the calender between flat moving belts, en route, providing a mechanism for folding the sheets so as to alter its width without cutting. This process has no similarity to Rossbach. Marks, British patent No. 29,379, December 31, 1904, provided an oscillating funnel for delivery of material to the distribution boxes in the making of linoleum. The problems were entirely different. Shunk, No. 803,720, November 7, 1905, provided a conveyor one of whose ends swung transversely back and forth across a horizontal apron which moved into an annealing oven, the object being to deliver objects in rows upon this apron.

It does not appear that the Master gave any consideration to the Shunk patent. The reason may be that it came from an entirely different art, and it can hardly be said that it anticipates Rossbach.

But the oscillating feature was new to this art and apparently gave a more satisfactory distribution than had been achieved before. We think there was invention within rather narrow limits.

Appellant's distributor arrangement differed from Rossbach in that the rubber was cut from the warming mill by adjustable knives, but not in a spiral strip. The strip was delivered by one moving belt to another, moving horizontally at right angles to the first, and toward the calender rolls. The second belt was mounted on a framework which caused its delivery end to move back and forth across the calender rolls. We think this horizontal oscillating belt is the full equivalent of the vertically depending oscillating belts of Rossbach, and agree with the Master that if another mechanism to achieve the same result had been obvious, the appellant might have used it to avoid Rossbach. There was infringement of both claims.

The Rossbach claims are not functional and void because of the use of the term "means" in describing its elements. It appears that this all-inclusive term is not used with reference to every means which would achieve distribution but to the specific body of the invention. Davis Sewing Machine Co. v. New Departure Mfg. Co., 6 Cir., 217 F. 775, 782.

We are satisfied that the discretion which lies with the District Court

in the matter of the award of costs was not abused. Michigan Carton Co. v. Sutherland Paper Co., 6 Cir., 29 F.2d 179, 184.

The decree of the District Court is affirmed.